# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) |
| INFORMATION ASSOCIATED WITH AN ACCOUNT STORED AT PREMISES CONTROLLED BY TWITTER, INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF  18 U.S.C. § 111(a)(1) AND OTHER OFFENSES | ) ) ) ) |

Case No.  22-SC-  1687

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

Located in the _____ Northern District of California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- [x] evidence of a crime;
- [ ] contraband, fruits of crime, or other items illegally possessed;
- [ ] property designed for use, intended for use, or used in committing a crime;
- [ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 111(a)(1) - Assaulting, Resisting or Impeding Certain Officers; | |
| 18 U.S.C. § 113(a)(4) - Striking, beating, or wounding of another Person within the Territorial Jurisdiction of the United States; | |
| 40 U.S.C. § 5104(e)(2)(F) - Act of Physical Violence in the U.S. Capitol Grounds. | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

- ❑ Continued on the attached sheet.
- ❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Garrett S. Churchill, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date: _____ 6/27/2022 _____

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____

Zia M. Faruqui
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means                    ☑ Original                    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  22-SC-1687 |
| INFORMATION ASSOCIATED WITH AN ACCOUNT STORED AT | ) | |
| PREMISES CONTROLLED BY TWITTER, INC. PURSUANT TO 18 | ) | |
| U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF  18 U.S.C. § | ) | |
| 111(a)(1) AND OTHER OFFENSES | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ Northern District of California _____ .

*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ July 10, 2022 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Zia M. Faruqui _____ .

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 6/27/2022 _____

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____

_____
Zia M. Faruqui
United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>22-SC-1687 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Twitter account with username @scott54917296, bearing account number 1410774835408650240 (the "SUBJECT ACCOUNT"), and which is stored at premises owned, maintained, controlled, or operated by Twitter, Inc., an electronic communications provider that accepts service of legal process at 1355 Market Street, Suite 900, San Francisco, California 94103.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.     **Information to be disclosed by Twitter, Inc. ("PROVIDER") to facilitate
       execution of the warrant**

For the time period July 1, 2021 to the present: To the extent that the information described

in Attachment A is within the possession, custody, or control of Twitter, including any messages,

records, files, logs, or information that has been deleted but are still available to Twitter, or have

been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Twitter is required to

disclose the following information to the government for the SUBJECT ACCOUNT listed in

Attachment A:

a.     All identity and contact information, including full name, e-mail address, physical

       address (including city, state, and zip code), date of birth, gender, hometown,

       occupation, and other personal identifiers;

b.     All past and current usernames, account passwords, and names associated with

       the SUBJECT ACCOUNT;

c.     The dates and times at which the SUBJECT ACCOUNT and profile were created,

       and the Internet Protocol ("IP") address at the time of sign-up;

d.     All IP logs and other documents showing the IP address, date, and time of each

       login to the SUBJECT ACCOUNT;

e.     All data and information associated with the profile page, including photographs,

       "bios," and profile backgrounds and themes;

f.      All "tweets" and Direct Messages sent, received, "favorited," or retweeted by the account, and all photographs or images included in those tweets and Direct Messages;

g.      All information from the "Connect" tab for the SUBJECT ACCOUNT, including all lists of Twitter users who have favorited or retweeted tweets posted by the SUBJECT ACCOUNT, as well as a list of all tweets that include the username associated with the SUBJECT ACCOUNT (*i.e.*, "mentions" or "replies");

h.      All video and all photographs and images in the user gallery for the SUBJECT ACCOUNT;

i.      All location data associated with the SUBJECT ACCOUNT, including all information collected by the "tweet with location" service;

j.      All information about the SUBJECT ACCOUNT's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the SUBJECT ACCOUNT was clicked;

k.      All data and information that has been deleted by the user of the SUBJECT ACCOUNT;

l.      A list of all of the people that the user follows on Twitter and all people who are following the user (*i.e.*, the user's "following" list and "followers" list) of the SUBJECT ACCOUNT;

m.      A list of all users that the account has "unfollowed" or blocked;

n.      All "lists" created by the SUBJECT ACCOUNT;

o.      All information on the "Who to Follow" list for the SUBJECT ACCOUNT;

3

p.     All privacy and SUBJECT ACCOUNT settings;

q.     All records of Twitter searches performed by the SUBJECT ACCOUNT,

including all past searches saved by the SUBJECT ACCOUNT;

r.     All information about connections between the SUBJECT ACCOUNT and third-

party websites and applications;

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information

set forth above via United States mail, courier, or e-mail to the following:

FBI Special Agent Garrett S. Churchill, by email at e-mail gschurchill@fbi.gov, telephone

number 202-440-0195, 601 4th St NW, Washington, D.C. 20535.

This warrant authorizes a review of electronically stored information, communications,

other records and information disclosed pursuant to this warrant in order to locate evidence, fruits,

and instrumentalities described in this warrant. The review of this electronic data may be

conducted by any government personnel assisting in the investigation, who may include, in

addition to law enforcement officers and agents, attorneys for the government, attorney support

staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the

disclosed electronic data to the custody and control of attorneys for the government and their

support staff for their independent review.

## II.      Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 113(a)(4), 40 U.S.C. § 5104(e)(2)(F), and 18 U.S.C. § 111(a)(1), (collectively the "SUBJECT OFFENSES"), since July 1, 2021 to the present, including, for the SUBJECT ACCOUNT identified in Attachment A, information pertaining to the following matters:

(a) Information that constitutes evidence concerning the riot that occurred at the U.S. Capitol on January 6, 2021; or assaults on law enforcement or members of the news media, on January 6, 2021;

(b) Communications about events at the U.S. Capitol on or about January 6, 2021, including any assault(s) on law enforcement or members of the news media;

(c) Information that constitutes evidence of the identification or location of the user(s) of the SUBJECT ACCOUNT;

(d) Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the SUBJECT ACCOUNT about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts; or (iii) were unlawfully present at or engaged in other criminal activity at the U.S. Capitol on or about January 6, 2021;

(e) Information that constitutes evidence indicating the SUBJECT ACCOUNT user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

(f) Information relating to any efforts to assault, resist, obstruct, or impede officers on January 6, 2021;

(g) Information that constitutes evidence concerning how and when the SUBJECT ACCOUNT was accessed or used, to determine the geographic and chronological context of SUBJECT ACCOUNT access, use, and events relating to the crimes under investigation and to the user of the SUBJECT ACCOUNT;

(h) The identification of the user of the SUBJECT ACCOUNT and other persons, including photographs and videos depicting clothing and other articles and paraphernalia that reflect evidence of having been present at or near the U.S. Capitol Building on or around January 6, 2021;

(i) Information relating to presence at the U.S. Capitol on or about January 6, 2021; and

(j) The identity of any person(s) who communicated with the SUBJECT ACCOUNT about matters relating to the events of January 6, 2021, including records that help reveal their whereabouts.

### III.     Government procedures for warrant execution

The government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

This warrant authorizes a review of records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH AN ACCOUNT STORED AT PREMISES CONTROLLED BY TWITTER, INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. § 111(a)(1) AND OTHER OFFENSES | Case No. 22-sc- 1687<br><br>**Filed Under Seal** |

*Reference:*     *USAO Ref. # 021R02212; Subject Account:* @scott54917296 *User ID: 1410774835408650240*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Garrett S. Churchill, a Special Agent with the Federal Bureau of Investigation ("FBI"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information which is associated with Twitter account @scott54917296, bearing account number 1410774835408650240 (the "SUBJECT ACCOUNT"), which is stored at premises owned, maintained, controlled, or operated by Twitter, Inc. ("Twitter" or the "PROVIDER"), an electronic communications services provider and/or remote computing services provider, which accepts service at and is headquartered at 1355 Market Street, Suite 900, San Francisco, California 94103. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B,

government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI), Washington Field Office.  I have been in this position since September 30, 2019 and am currently assigned to investigate Public Corruption and Government Fraud in the District of Columbia.  As a member of the Washington Field Office's Criminal Branch II, I have also been assisting in the investigation of violent crimes committed against law enforcement officers and members of the media in or around the U.S. Capitol Building on January 6, 2021.  My primary responsibilities include conducting investigations involving public corruption, fraud, civil rights crimes and other related violations of federal criminal law. I have received a Juris Doctorate from the University of Georgia and have been a member of good standing of the State Bar of Georgia since 2010.  I have experience with federal criminal law, the Federal Rules of Evidence and the Federal Rules of Criminal Procedure.  During my training at the FBI Academy, Quantico, Virginia, I received training in areas such as physical surveillance, legal statutes and procedures, financial investigations, confidential source management, Fourth Amendment searches, the drafting of search warrant affidavits, probable cause and digital forensic data analysis.

3.      I base the facts set forth in this affidavit upon my personal knowledge, information obtained during my participation in this investigation, review of documents to include business and bank records and official government records, knowledge obtained from other individuals including law enforcement personnel, and communications with others who have personal knowledge of the events and circumstances described herein.  Because this affidavit is being submitted for the limited purpose of enabling this Court to make a judicial determination of probable cause to issue a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish

the legal basis for the issuance of a search warrant.  The dates listed in this affidavit should be read as "on or about" dates.  Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements.  All times provided in this affidavit should be read as "on or about" times and are given in Eastern Standard Time (EST) unless otherwise noted.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that BENJAMEN BURLEW ("BURLEW") has committed violations of 18 U.S.C. § 111(a)(1) (Assaulting, Resisting or Impeding Certain Officers), 18 U.S.C. § 113(a)(4) (Striking, beating, or wounding of another Person within the Territorial Jurisdiction of the United States) and 40 U.S.C. Section 5104(e)(2)(F) (Act of Physical Violence in the U.S. Capitol Grounds).  There is also probable cause to search the SUBJECT ACCOUNT, as further described in Attachment A, which appears to have been utilized by BURLEW to communicate about his involvement in the SUBJECT OFFENSES, for the things described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C.  *See* 18 U.S.C. § 3237(a).

**PROBABLE CAUSE**

*Background – The U.S. Capitol on January 6, 2021*

6.      U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.      At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway.  All of this area was barricaded and off limits to the public on January 6, 2021.

8.      The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

10.     On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.  During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which

took place on November 3, 2020 ("Certification").  The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).  Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

11.     As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

12.     At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

13.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

14.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  Your affiant is aware from the context of this investigation that some individuals in the crowd believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

15.     At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or

weapons checks by USCP officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

16.     Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this."



17.     Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and

locked it down.  USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

18.    At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the federal police officers were injured and several were admitted to the hospital.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers.  They also took police equipment from overrun police including shields and police batons.  The actions taken by these subjects resulted in the disruption and ultimate delay of the vote Certification.

19.    Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

20.    At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

21.    At around 2:47 p.m. EST, subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



22.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



23.     One subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



24.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals are expected to be taken into custody.





25.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

26.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

27.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

28.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all the subjects.

29.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 pm after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

30.     After the U.S. Capitol was breached, United States Capitol Police (USCP) requested assistance from law enforcement agencies in the area to protect the Capitol, keep people from entering the Capitol, and expel the crowd that was inside the Capitol. Multiple officers with the Metropolitan Police Department and other law enforcement officers came to assist.  Beginning around 8:00 p.m. EST, the Senate resumed work on the certification.

31.     Beginning around 9:00 p.m. EST, the House resumed work on the certification.

32.     Both chambers of Congress met and worked on the certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

33.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

34.     Additionally, news coverage of January 6, 2021 documented numerous attacks on members of the news media who were present to cover the events at, around and in the U.S. Capitol building.  These included reports of members of the news media being harassed, threatened, robbed, and assaulted based on their perceived roles as journalists, and equipment belonging to several news organizations was stolen, damaged and/or destroyed.

### Facts Specific to This Application

### 1.  Assault on a Member of the News Media

35.     As explained further below, two videos from separate sources taken during the riots on January 6, 2021, at the United States Capitol depict an individual, subsequently identified as BENJAMEN BURLEW ("BURLEW"), engaging in a physical assault against a credentialed member of the news media ("MONM"), an Associated Press photographer (hereafter referred to as "the MONM victim").  This assault included physically grabbing and shoving the MONM victim and pushing him forcefully over a low wall.  These crimes occurred in the general area of the Lower West Terrace of the U.S. Capitol Building during the riots on January 6, 2021 at approximately 1:35 PM.

36.     Your affiant reviewed publicly available video footage depicting the assault of the MONM victim ("the Video") that was retrieved from the verified Instagram account of another Associated Press photographer and the MONM victim's colleague who was present with the MONM victim during the assault and filmed the incident as it occurred (the "MONM witness").  The MONM witness later posted the Video to his Instagram account and the footage was reposted publicly by various media outlets on their respective websites and incorporated into reporting about the events of January 6, 2021 (e.g., an article by Associated Press journalist David Bauder, titled "Journalists recount harrowing attacks amid Capitol Riot" posted on the Associated Press's website   on   January   8,   2021,   and   accessible   at   the   following

link:https://apnews.com/article/donald-trump-new-york-journalists-media-social-media-cba6bd7b93be0ade1da714a32c33d74c).

37.     Your affiant reviewed the Video and observed an individual with the following identifying characteristics: white male with short, thinning black hair and a mixed black and gray beard, wearing a blue and white neck bandana, a green/gray camouflage pattern quarter zip jacket and carrying a dark green backpack.  This individual was later identified through investigation, as explained in detail below, as BURLEW (circled in red).  BURLEW could be observed on the Video shoving the MONM victim (circled in yellow) using BURLEW's right hand placed on the MONM victim's back, over the MONM victim's black backpack.





38.    After disengaging from the assault on the MONM, BURLEW was then subsequently observed on the Video lunging towards the MONM victim as the MONM victim was being shoved backwards towards a low stone wall, which lies several feet above the grass of the west lawn of the U.S. Capitol building.  BURLEW was observed to grab the MONM victim's upper chest with BURLEW's left hand and the MONM victim's right leg and knee with BURLEW's right hand and forcefully throw and push the MONM victim over the wall and to the lawn several feet below.  Faint green tattoo markings on BURLEW's left hand were observed by your affiant during this altercation. The MONM victim, together with at least one individual that was standing on the low wall behind the MONM victim and inadvertently caught up in the melee, was observed to land on his back on the ground several feet below the wall, on the grounds of the west lawn of the U.S. Capitol, while BURLEW leaned over the wall and observed the MONM victim's fall.



39.     Based on the timing and location of the above-described assault, your affiant reviewed the body-worn camera footage (the "BWC Video") of a District of Columbia Metropolitan Police Department ("MPD") Officer who was standing near the Lower West Terrace of the U.S. Capitol during the approximate time that the assault occurred. The officer was

positioned near a line of bike racks, which was being used as a barrier against the assembling crowd by officers of the MPD and U.S. Capitol Police. The bike rack was positioned close to the top lip of the stairs that the MONM victim was observed to be standing on at the beginning of the Video.   Your affiant observed BURLEW on the BWC Video at approximately 1:35:36 PM.  This observation of BURLEW appears consistent with BURLEW's location while shoving the MONM victim for the first time, as described supra paragraph 19.

40.     After review of the aforesaid videos, the FBI utilized investigative resources to develop multiple images of BURLEW, at the time an unknown subject, from the Video and the BWC Video. These images were assigned BOLO #195 (all points bulletin, also known as "be on the look-out") and were placed on the FBI's "Most Wanted" U.S. Capitol Violence webpage, currently accessible at https://www.fbi.gov/wanted/capitol-violence (the "Capitol Violence Webpage"), to allow members of the public to review images of BOLO #195, as well as BOLO images of other offenders whose conduct had been identified as criminal but whose identities were unknown, and assist the FBI in identifying these offenders.

41.     A group of internet sleuths known as "Sedition Hunters" on their social media accounts (collectively, the "Sedition Hunters"), who had previously provided assistance to the FBI in connection with the Capitol riots investigation, submitted a tip consisting of a link to a publicly available video posted on YouTube to the YouTube channel of Citizen Media News (the "YouTube Video"), recorded by an unknown individual (the "Recorder"). The Sedition Hunters indicated that the unknown subject known as BOLO #195 could be observed in the YouTube Video and appeared to state his name and the state of his residence to the Recorder.  Review of the YouTube channel to which the YouTube Video was posted appears to be associated with CitizenMedia News (www.citizenmedianews.com), which purports to be a "grassroots" journalism and media platform.

42.     Your affiant also reviewed the YouTube Video and observed an individual matching the description of BURLEW (white male, short, thinning black hair, mixed black and gray beard, blue and white neck bandana, green/gray camouflage pattern quarter zip jacket) provide his name as "Ben Burlew" [spelled phonetically] and his state of residence as "Oklahoma."  Additionally, your affiant observed distinctive green tattoo markings on the back side of the individual's left hand, consistent with the markings observed on BURLEW's hand in the Video.



43.     Using the self-identification, your affiant reviewed Oklahoma driver's license information and located an individual named "BENJAMEN SCOTT BURLEW" whose appearance in his driver's license photo was consistent with the images of BURLEW observed by your affiant in The Video, the BWC Video, and the YouTube Video.

44.     Further, your affiant conducted a review of other submitted tips and ongoing FBI investigations that may have also implicated or mentioned BURLEW.  This search revealed that on January 9, 2021, an individual ("CW-2") submitted an on-line tip to the FBI National Threat Operations Center ("NTOC") and reported that Benjamen Burlew was in Washington, D.C. on January 5, 2021, and January 6, 2021, and possibly entered the U.S. Capitol building.  CW-2 reported that Burlew was a former serviceman in the U.S. Army and provided identifiers for BURLEW, including his social security number, his current address and his cellphone number.

CW-2 indicated that BURLEW's wife would likely be the named party on any bank accounts, property or financial obligations owned by or accruing to BURLEW.

45.    Based on these allegations, on January 13, 2021, CW-2 was re-contacted and interviewed telephonically by an FBI agent and provided additional information. CW-2 had observed a video phone call between BURLEW and a close family member of BURLEW ("Family Member-1") on or about December 24, 2020.  During the call, CW-2 had overhead BURLEW state that he was planning to go to Washington, D.C. on January 4, 2021, in a caravan and "storm the Capitol." CW-2 had also overhead a phone call between BURLEW and Family Member-1 on or about January 6, 2021, in which BURLEW appeared to be in Washington, D.C. and in which BURLEW had stated that "people were acting silly" and that it was time for BURLEW to leave. CW-2 did not know of any photographs of BURLEW inside the Capitol building or if BURLEW had participated in illegal activity while present in Washington, D.C.  CW-2 clarified his/her initial report that he/she had no actual knowledge that BURLEW had been inside of the U.S. Capitol but that he/she had overhead him say on or about December 24, 2020, that he had planned to "storm the Capitol."

46.    Subsequently, on March 11, 2021, FBI agents and task-force officers ("TFO") attempted to interview BURLEW at the residential address provided by CW-2 (the "BURLEW Residence").  The agents contacted BURLEW.  BURLEW answered the call and identified himself.  BURLEW declined to answer questions about whether he had been in Washington, D.C. on January 6, 2021, or participated in any of the civil unrest that took place during the day. BURLEW further advised the interviewing agents that he was recording their interaction and would not speak further with agents without his lawyer present.

47.    On March 15, 2021, a second telephonic interview of BURLEW was attempted by FBI agents and/or TFOs.  BURLEW was called and BURLEW again picked up the call. BURLEW

was asked to schedule an interview with the agents and advised that his attorney could accompany BURLEW to the interview. BURLEW stated that he had spoken with his lawyer who advised BURLEW that he should not speak with the FBI. The interviewing agents advised BURLEW of the nature of the interview and BURLEW stated that the FBI was lying about information received that BURLEW was present in Washington, D.C. on January 6, 2021, and stated that he did not wish to speak with the FBI regarding his presence or conduct in Washington, D.C. on or about January 6, 2021.

48.     On or about the week of May 24, 2021, an individual ("CW-3") with a familial relationship to BURLEW called the FBI NTOC to report the identity of FBI BOLO #195 as BURLEW. CW-3 alleged that BURLEW had asked CW-3 to go to Washington, D.C. with BURLEW on January 6, 2021, but that CW-3 had declined BURLEW's invitation.  CW-3 stated that BURLEW had prior military service in the U.S. Army and that BURLEW lived "out in the middle of nowhere" in Oklahoma.

49.     On or about the week of May 31, 2021, an individual ("CW-4") called the FBI NTOC to report the identity of FBI BOLO #195 as BURLEW. On June 2, 2021, your affiant contacted CW-4 telephonically for an interview. CW-4 alleged that BURLEW and CW-4 had been co-workers in the past and that BURLEW's name had been "going around" their place of work as wanted by the FBI.  CW-4 had recognized BURLEW based on his build, facial features, hair and beard, which were consistent with the images of BOLO #195 posted on the Capitol Violence Webpage.  Due to his limited relationship with BURLEW and the fact that gloves were often worn on the job by CW-4 and his coworkers, CW-4 did not recall whether BURLEW had any tattoos or markings on his left hand and arm.

50.     On or about June 24, 2021, CW-2 was re-interviewed by FBI agents and shown the aforesaid images of BOLO #195.  CW-2 was able to positively identify these images as BURLEW.

19

CW-2 was asked if BURLEW had any unique identifying marks or features, such as scars or tattoos. CW-2 was able to identify the distinctive green tattoo on BURLEW's left hand that was observed by your affiant.

51.     Based on the information above, on June 25, 2021, your affiant submitted a 27-page affidavit in support of a criminal complaint concerning BURLEW's violations of 40 U.S.C. § 5104(e)(2)(F) and 18 U.S.C. § 113(a)(4), and an arrest warrant for BURLEW (the "Arrest Warrant") in connection with such violations to the United States District Court for the District of Columbia. The Hon. G. Michael Harvey, United States Magistrate Judge, United States District Court for the District of Columbia, issued the aforesaid complaint and the Arrest Warrant on June 25, 2021. See Case Number 1:21-mj-00501.  Special Agents from the FBI Oklahoma City Field Office (FBI-OC) executed an arrest of BURLEW, pursuant to the Arrest Warrant, on or about August 18, 2021.

### 2.  *Assault on Federal Officer*

52.     The investigation also revealed that BURLEW assaulted a law enforcement officer on January 6, 2021, in the vicinity of the U.S. Capitol, prior to the assault on the MONM victim, as specified below at approximately 1:16 pm.  Subsequent to the arrest of BURLEW and a press release made by the United States Attorney's Office related to BURLEW and the charge on which he was arrested, an anonymous individual ("CW-5") submitted a tip to the FBI's tip-line that though authorities had arrested BURLEW for the MONM victim assault, BURLEW had also engaged in additional criminal conduct on January 6, 2021, while wearing a different set of clothing than that displayed in BURLEW's original FBI BOLO photographs. Specifically, CW-5 alleged that BURLEW had engaged in an assault against a MPD officer on January 6, 2022, in addition to the known assault committed against the aforesaid MONM victim.

53.     Review of several publicly available YouTube video links provided by CW-5 led to the observation that an individual had assaulted a black male DC MPD police officer (the "Victim Officer") in the vicinity of the stairs of the Lower West Terrace of the U.S. Capitol Building on January 6, 2021.  Screenshots of the assailant (circled in red) captured from one of the video links provided are set forth below.  The assailant is seen to be wearing a black ballcap with orange lettering "Ridgecut", which your affiant knows to be a brand of workwear apparel:



54.     The assailant could be observed rushing at the Victim Officer and then engaged in a physical scuffle with him, appearing to attempt to tackle and/or wrestle the Victim Officer to the ground. Subsequently, the assailant was sprayed by OC/pepper spray repeatedly by another DC MPD police officer in the vicinity, and disengaged from the assault and ran away, back into the crowd.



55.     Review of the aforesaid videos resulted in the identification of DC MPD officers (based on visible name plates) that would have vantage points to have caught the assault of the

Victim Officers on their BWC. Subsequently, your affiant acquired and reviewed BWC footage of these DC MPD officers, which resulted in the positive identification of the Victim Officer. The BWC footage of the Victim Officer was also procured and reviewed. Generally, the review of this BWC footage further substantiated the assault on Victim Officer by the assailant.  A screenshot of the assailant charging the Victim Officer, as captured on the BWC footage from one of the aforesaid MPD officers, is set forth below:



56.      Subsequent to the review of the aforesaid BWC footage, the videos provided by CW-5, and other publicly available videos and media, the Victim Officer was interviewed by FBI agents.  During the interview, the Victim Officer was shown the aforesaid BWC footage and some of the publicly available videos depicting his assault by BURLEW. The Victim Officer stated during the interview that he recalled the specific physical altercation with the individual pictured above.

57.      The Victim Officer did not know the identity of his assailant but identified the assailant as BURLEW when shown multiple images of BURLEW, dressed in the alternative set of clothing described above, that were pulled from the BWC footage and videos referred to above.

58.      The assailant, while wearing different clothing than that worn by BURLEW during the MONM victim assault, appeared to be wearing a backpack (green backpack with distinctive red pull tabs) identical to that worn by BURLEW during the MONM assault, as well as pants and

shoes consistent with those worn by BURLEW during the MONM assault. In addition, the assailant's face, voice, and profile were all visible and audible on the video links submitted by CW-5 and in the BWC footage reviewed by your affiant, and were found to be consistent with BURLEW's face, voice, and profile as they appeared in the review of the aforesaid videos and images from the MONM assault. These similarities led to the identification of the assailant as BURLEW.

59.     Timestamps on the BWC footage established that the assault against the Victim Officer happened prior to the assault against the MONM victim described above. The additional clothing (trucker hat, gloves, black long-sleeved upper garment) worn by BURLEW during this assault appear to represent heavier, winter-type clothing than what BURLEW wore during the MONM victim assault. BURLEW is not seen wearing the hat, gloves or black upper garment in his later assault of the MONM victim. The hat can clearly be seen knocked off BURLEW's head during the altercation with the Victim Officer and is left behind by BURLEW as he fled, explaining its absence in later images. Your affiant believes that BURLEW may have discarded the gloves and black upper garment due to the fact these garments were likely exposed to the chemical irritants used against BURLEW by MPD officers during this incident.

60.     Law enforcement also obtained a social media post of BURLEW, which appears to be a video been taken inside of a residence. In the video, BURLEW can be seen talking to the camera, loading cartridges from a box of ammunition into a handgun magazine, and wearing a black hat with a similar orange Ridgecut logo to that worn by BURLEW in the Victim Officer assault and a camouflage pattern pull-over garment similar to that worn by BURLEW in the MONM victim assault.

61.     During the video, BURLEW notes, "Donald Trump is calling for us to come to America right now to save this place" and that "there are a bunch of us going right now …" and

"we don't mess around."   A tattoo on his left hand can be seen (circled in yellow in the below screenshot).  While the date of the video is unknown, your affiant believes that it was taken prior to January 6, 2021.  Two illustrative screenshots taken from the video are set forth below:



62.     On or about October 27, 2021, BURLEW was indicted by a District of Columbia grand jury for the SUBJECT OFFENSES, to include one count of 18 U.S.C. § 111(a)(1) for the assault committed on the Victim Officer.

### 3. Use of Subject Account

63.     In parallel with the course of the investigation but without coordination with the FBI's investigation, Sedition Hunters continued to gather information about BURLEW and other individuals posted for identification as "BOLOS" on the FBI's Capitol Violence Webpage. Sedition Hunters assigned nicknames to each of the individuals listed on the Capitol Violence Webpage. These nicknames turned into hashtags that were used in social media postings made by Sedition Hunters via the Sedition Hunters twitter account, @SeditionHunters (the "Sedition Hunters Twitter Account"), and other open source/civilian investigators on Twitter and other social

media while attempting to assist law enforcement efforts to identity images and media that contained the relevant BOLO.  The nickname assigned to BOLO #195 by the Sedition Hunters was "CamoCrazyEyes."

64.     Due to the fact that the grand jury investigation into BURLEW's conduct was secret and that the criminal complaint issued in June 2021 was sealed prior to BURLEW's arrest in August 2021, the Sedition Hunters Twitter account continued to make posts about BURLEW and requests for images and media depicting criminal conduct committed by BURLEW, using the hashtag #CamoCrazyEyes and the BOLO #195 identifiers.  On July 1, 2021, the Twitter users were unaware that the FBI had positively identified BOLO #195 as BURLEW and from time to time posted or re-tweeted information seeking the identification of BOLO #195 and other BOLO photographs.

65.     On or about July 1, 2021, the Sedition Hunters Twitter Account posted and/or re-tweeted a post related to the FBI seeking information on the identification of BOLO #195.  In response to this post, an individual purporting to be BOLO #195 had allegedly contacted Sedition Hunters Twitter Account via direct message using the SUBJECT ACCOUNT.  On or about July 1, 2021, the Sedition Hunters Twitter Account then posted a screenshot of the alleged Twitter direct messages, which were sent from the SUBJECT ACCOUNT.  The direct messages allegedly sent from the SUBJECT ACCOUNT asked: "Why are you looking for me" and "There will be a lawsuit against you soon." A screenshot of the post is set forth below:



66.     On or about July 2, 2021, Sedition Hunters provided a tip to the FBI that the SUBJECT ACCOUNT had engaged the Sedition Hunters Twitter Account and threatened a lawsuit against Sedition Hunters. According to the tip, the user of the SUBJECT ACCOUNT appeared to be BURLEW due to the following observations: (a) the user of the SUBJECT ACCOUNT used the display name @scott (known to be BURLEW's middle name), (b) one of the BOLO #195 images posted on the Capitol Violence Webpage was incorporated into the SUBJECT ACCOUNT's profile picture (subsequently changed on the same day to a black background), and

26

(c) the SUBJECT ACCOUNT made multiple self-referential statements in posts on Twitter indicating that the user of the SUBJECT ACCOUNT was BURLEW.

67.     A review of the posts made by the SUBJECT ACCOUNT by your affiant indicated that the SUBJECT ACCOUNT had joined Twitter in July 2021 and as of the date of this warrant, the most recent post made by the SUBJECT ACCOUNT was on August 31, 2021.  At some point after July 1, 2021, on which the "display name" of the SUBJECT ACCOUNT appeared to be "Scott", the display name was changed to "CamoCrazyEyeslovesgodandcountry", an apparent reference to the nickname assigned to BURLEW by the Sedition Hunters.  A review of the posts made by the SUBJECT ACCOUNT revealed multiple posts that indicated that the user of the SUBJECT ACCOUNT was BURLEW.  Further, this review revealed that multiple posts had been made on the SUBJECT ACCOUNT in which the user of the SUBJECT ACCOUNT, believed by your affiant to be BURLEW, made statements constituting admissions that BURLEW had committed the SUBJECT OFFENSES.  A handful of examples of posts that suggested the user of the SUBJECT ACCOUNT was BURLEW and that contained references to BURLEW's commission of the SUBJECT OFFENSES are detailed in the following paragraphs.

68.     In a reply made to the Sedition Hunters post described above, the user of the SUBJECT ACCOUNT indicated to the Sedition Hunters that he had already spoken to law enforcement and claimed that he "never went into the building".  In response to a post suggesting BURLEW assaulted a federal officer and a media member made by an unknown Twitter user using the @SeditionSleuth account, the user of the SUBJECT ACCOUNT posted the following response: "How about assault on a Civilian peacefully protesting" and stated, "This is all self defense and very probable [sic] in court."  A screenshot of these exchanges is set forth below:



69.     On July 12, 2021, the SUBJECT ACCOUNT posted the following: "Thank you for all of my defamation evidence. Thanks again."    In response, another Twitter user, @PotrzebieSystem replied: "Bencephus, it ain't defamation if it's true!"   The post included references to BOLO #195 and screenshots of BURLEW from the Capitol Violence Webpage.   The SUBJECT ACCOUNT responded: "See I would have to have a warrant for my arrest which I do t [sic]. You keep spreading false info about me with no conviction with no charge. So defamation." A screenshot containing a portion of this exchange is set forth below:



70.    Later in the same Twitter thread, and several weeks after the initial post and after BURLEW's arrest in August, @PotrzebieSystem responded: "Keep your nose clean, Benjamen". Your affiant believes this is a reference to how BURLEW's previous post related to defamation ended up looking foolish in light of BURLEW's arrest in early August 2021, and that because of this outcome, BURLEW must have been under the influence of drugs when he made the previous post.  In response, BURLEW tweeted "Don't do drugs. So always clean.. lol" and a picture of what appears to be BURLEW standing near the Washington Monument, wearing clothing (black

ballcap, gloves and a green backpack with red pulltabs) consistent with the clothing observed to

be worn by BURLEW in the BWC Video during his assault of the Victim Officer:



71.   On July 15, 2021, the SUBJECT ACCOUNT, apparently in reference to other

posters accusing BURLEW of assault on law enforcement and media members, made a post that

appeared to be an attempt to justify the criminal actions committed by BURLEW on January 6,

2021 in the vicinity of the U.S. Capitol: "…I did nothing wrong. Didn't go in the building [your

affiant believes this is a reference to the U.S. Capitol]. They [your affiant believes this is a

reference to law enforcement officers] shot me first.  And on top of that the guy [your affiant believes this is a reference to the MONM victim] that got lifted on the ledge had already started a confrontation with me prior. Again not worried. And another screenshot. Can't wait to sue."  The post appears to constitute an admission that BURLEW engaged in the SUBJECT OFFENSES and an attempt to justify the conduct, as set forth in the below screenshot:



72.     On July 17, 2021, the SUBJECT ACCOUNT made a self-referential post that contained a message as well as a picture.  The picture appeared to depict BURLEW, an individual known to be BURLEW's wife, and three minor children.

73.     Based on these communications, probable cause exists to believe that BURLEW is the individual operating the SUBJECT ACCOUNT, and probable cause exists to believe that communications sent to and from the SUBJECT ACCOUNT may contain evidence, fruits and instrumentalities of the SUBJECT OFFENSES, including but not limited to, admissions of guilt concerning the SUBJECT OFFENSES made by BURLEW.

***BACKGROUND CONCERNING PROVIDER'S ACCOUNTS***

74.     PROVIDER is the provider of the internet-based account identified by the username @scott54917296 and UID 1410774835408650240.

75.     PROVIDER owns and operates a free-access social-networking website of the same name that can be accessed at http://www.twitter.com.  Twitter allows its users to create their own profile pages, which can include a short biography, a photo of themselves, and location information.  Twitter also permits users create and read 140-character messages called "tweets," and to restrict their "tweets" to individuals whom they approve.  These features are described in more detail below.[1]

76.     Upon creating a Twitter account, a Twitter user must create a unique Twitter username and an account password, and the user may also select a different name of 20 characters or fewer to identify his or her Twitter account.  The Twitter user may also change this username, password, and name without having to open a new Twitter account.

77.     Twitter asks users to provide basic identity and contact information, either during the registration process or thereafter.  This information may include the user's full name, e-mail addresses, physical address (including city, state, and zip code), date of birth, gender, hometown, occupation, and other personal identifiers.  For each user, Twitter may retain information about the date and time at which the user's profile was created, the date and time at which the account was created, and the Internet Protocol ("IP") address at the time of sign-up.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access a given Twitter account.

---

[1] At times, social media providers such as PROVIDER can and do change the details and functionality of the services they offer. While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

78.     A Twitter user can post a personal photograph or image (also known as an "avatar") to his or her profile and can also change the profile background or theme for his or her account page.  In addition, Twitter users can post "bios" of 160 characters or fewer to their profile pages.

79.     Twitter also keeps IP logs for each user.  These logs contain information about the user's logins to Twitter including, for each access, the IP address assigned to the user and the date stamp at the time the user accessed his or her profile.

80.     As discussed above, Twitter users can use their Twitter accounts to post "tweets" of 140 characters or fewer.  Each tweet includes a timestamp that displays when the tweet was posted to Twitter.  Twitter users can also "favorite," "retweet," or reply to the tweets of other users. In addition, when a tweet includes a Twitter username, often preceded by the @ sign, Twitter designates that tweet a "mention" of the identified user.  In the "Connect" tab for each account, Twitter provides the user with a list of other users who have "favorited" or "retweeted" the user's own tweets, as well as a list of all tweets that include the user's username (i.e., a list of all "mentions" and "replies" for that username).

81.     Twitter users can include photographs or images in their tweets.  Each Twitter account also is provided a user gallery that includes images that the user has shared on Twitter, including images uploaded by other services.

82.     Twitter users can also opt to include location data in their tweets, which will reveal the users' locations at the time they post each tweet.  This "tweet with location" function is off by default, so Twitter users must opt in to the service.  In addition, Twitter users may delete their past location data.

83.     When Twitter users want to post a tweet that includes a link to a website, they can use Twitter's link service, which converts the longer website link into a shortened link that begins with http://t.co.  This link service measures how many times a link has been clicked.

84.     A Twitter user can "follow" other Twitter users, which means subscribing to those users' tweets and site updates.  Each user profile page includes a list of the people who are following that user (<u>i.e.</u>, the user's "followers" list) and a list of people whom that user follows (*i.e.*, the user's "following" list).  Twitter users can "unfollow" users whom they previously followed, and they can also adjust the privacy settings for their profile so that their tweets are visible only to the people whom they approve, rather than to the public (which is the default setting).  A Twitter user can also group other Twitter users into "lists" that display on the right side of the user's home page on Twitter.  Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting, based on the types of accounts that the user is already following and who those people follow.

85.     In addition to posting tweets, a Twitter user can also send Direct Messages (DMs) to one of his or her followers.  These messages are typically visible only to the sender and the recipient, and both the sender and the recipient have the power to delete the message from the inboxes of both users.  As of January 2021, Twitter displayed only the last 100 DMs for a particular user, but older DMs are stored on Twitter's database.

86.     Twitter users can configure the settings for their Twitter accounts in numerous ways.  For example, a Twitter user can configure his or her Twitter account to send updates to the user's mobile phone, and the user can also set up a "sleep time" during which Twitter updates will not be sent to the user's phone.

87.     Twitter includes a search function that enables its users to search all public tweets for keywords, usernames, or subject, among other things.  A Twitter user may save up to 25 past searches.

88.     Twitter users can connect their Twitter accounts to third-party websites and applications, which may grant these websites and applications access to the users' public Twitter profiles.

89.     If a Twitter user does not want to interact with another user on Twitter, the first user can "block" the second user from following his or her account.

90.     In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints.  Social-networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.  Twitter may also suspend a particular user for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

91.     As explained herein, information stored in connection with a Twitter account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Twitter user's account information, IP log, stored electronic communications, and other data retained by Twitter, can indicate who has used or controlled the Twitter account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, communications, "tweets" (status updates) and "tweeted" photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Twitter account at a relevant time.  Further, Twitter account activity can show how and when the account was accessed or used.  For example, as described herein, Twitter logs the Internet Protocol (IP) addresses from which users access their

accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Twitter access, use, and events relating to the crime under investigation.  Additionally, Twitter builds geo-location into some of its services.  If enabled by the user, physical location is automatically added to "tweeted" communications.  This geographic and timeline information may tend to either inculpate or exculpate the Twitter account owner.  Last, Twitter account activity may provide relevant insight into the Twitter account owner's state of mind as it relates to the offense under investigation.  For example, information on the Twitter account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a criminal plan) or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

92.    Therefore, the computers of Twitter are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Twitter, such as account access information, transaction information, and other account information.

93.    In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for PROVIDER subscribers), as well as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services.  In my training and experience, all of  that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false

information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

94.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

### REQUEST TO SUBMIT WARRANT BY TELEPHONE
### OR OTHER RELIABLE ELECTRONIC MEANS

95.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney

Joseph H. Huynh, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

### *CONCLUSION*

96.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.


Respectfully submitted,

_____
Garrett S. Churchill
Special Agent
Federal Bureau of Investigation


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1
by telephone, this 27th day of June, 2022.


_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____. I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a. all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b. such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1. the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2. the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                                        Signature